# MATT WILLIAMS v. THE STATE.

No. 22421. Delivered April 14, 1943.

The opinion states the case.

*W. N. Harkness,* of Texarkana, for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

This is a rape case, with the death penalty assessed.

At the outset, we are confronted with the contention that the trial court was without jurisdiction.

The offense was alleged to have been committed on July 3rd, 1942. The indictment was returned and filed on the 10th day of July, 1942. On the 17th day of July, 1942, or seven days after the return of the indictment, the trial court entered the following order, changing the venue of the case:

"On this the 17th day of July, A. D. 1942, in the above styled and numbered cause the court being of the opinion that a trial alike fair and impartial to the accused and the State cannot be reasonably *he* had in said cause for the reason that this is a cause in which the accused is accused of Rape upon a small white child and since the return of the indictment *in*this cause there has been lynching in this County of a negro accused of a like offense that feeling is so high among the citizens of the county that it would be impractical, if not impossible to have a fair and impartial trial in said county and on these grounds the court on his own motion has ordered adjudged and decreed that the venue in said cause be and the same is hereby changed to Red River County in this 102nd Judicial District of Texas."

Five days after the entry of the foregoing order, the trial court entered the following order, setting aside the order changing the venue:

"BE IT REMEMBERED that on this the 22nd day of July, A. D. 1942, the defendant in the above styled and numbered cause being present in open court came on to be considered the question of setting aside the order changing the venue in this cause to Red River County Texas, and it appearing to the court that no action had been taken in respect to the order changing the venue in this cause other than the making and entry of said order and it further appearing to the court that said order was improperly made and without the consent of the defendant and the defendant in open court consenting that said order making said change should be set aside and that the trial of said cause be had in Bowie County, Texas.

"It is therefore ordered, adjudged and decreed by the court that the order heretofore made on the 17th day of July, A. D. 1942, changing the venue in said cause to Red River County, Texas, be and the same is hereby set aside annulled and held for naught and that this cause be and the same is retained on the docket of this court of Bowie County, Texas."

When the case was called for trial on the 30th day of July, 1942, the appellant filed his plea challenging the jurisdiction of the court to try the case, asserting that the order changing the venue had fixed jurisdiction of the case in the District Court of Red River County, and that the trial court was without authority to recall the case or to set aside the order changing the venue. The plea was overruled and a proper exception reserved.

The bill of exception bringing this matter forward fails to reflect any reason why the order changing the venue was set aside, other than, as stated in the order, that it "was improperly made and without the consent of the defendant." There is no finding or suggestion that the facts as set forth in the order changing the venue and upon which the order was based did not exist or no longer existed. Upon the hearing of the plea, the appellant testified, among other things: "I was present when this case was transferred back down to Bowie County. I was asked if it would be satisfactory or agreeable to me if it were transferred back here, but I didn't know what he meant. I did not say it was agreeable with me for it to be transferred back down here. I told him to suit himself, if it was all right with him I didn't know nothing to say. I did not know what was meant when they told me it would be transferred back down here. If I had known what he meant I would not have agreed for it to be transferred back down here. I didn't know what it meant. I did not want to be tried in Bowie County." At such time the appellant was without counsel to represent him, and it was only after the order setting aside the change of venue was entered that counsel was appointed to represent him.

The foregoing testimony and facts were not challenged by the testimony of any other witness.

Under the circumstances noted, no effect is to be given to the statement in the order setting aside the change of venue that appellant consented thereto, for, if jurisdiction had attained in the District Court of Red River County, consent of the appellant could not deprive that court of jurisdiction; and, if jurisdiction had not attached in that court, appellant's consent was unnecessary.

It is thus made to appear that the question here presented is whether, upon the entry of the order changing the venue, the District Court of Bowie County lost jurisdiction of the case and

jurisdiction thereof automatically became lodged in the District Court of Red River County.

The power to change the venue of criminal cases is provided by the Constitution of this State (Art. III, Sec. 45). The mode, manner, and method which that power is to be exercised by the courts is provided by statute (Subdivision 10, Chap 4, Title 7, Code of Criminal Procedure.)

Art. 560, C. C. P., reads as follows: "Whenever in any case of felony the judge presiding shall be satisfied that a trial, alike fair and impartial to the accused and to the State, can not, from any cause, be had in the county in which the case is pending, he may, upon his own motion, order a change of venue to any county in his own, or in an adjoining district, stating in his order the grounds for such change of venue."

In ordering the change of venue to Red River County, the trial court found the existence of facts warranting the change of venue under said Article. Upon its face, the order was regular and was in accordance with law.

In the order setting aside the change of venue, there is no finding or suggestion that the facts found to exist in ordering the change of venue no longer existed or did not in fact exist in the first instance. In what particular the order changing the venue "was improperly made" the record does not reflect.

Under the record as thus presented, the first question presented for determination is whether the District Court of Bowie County, upon the entry of the order changing the venue of the case, lost jurisdiction thereof.

In the broad sense, venue, as applied to criminal cases, means the place in which prosecutions are to begin; while jurisdiction means the power of the court to hear and to determine the case. The terms are not synonymous. Venue may be acquired by consent—but not jurisdiction. Taylor v. State, 81 Tex. Cr. R. 347, 197 S. W. 196.

Touching the effect of a change of venue as changing jurisdiction, the rule is announced in 27 R. C. L. 825, Sec. 46, as follows:

"The effect of a change of venue is to remove the cause absolutely from the jurisdiction of the court awarding the change.

Thereafter, such court can issue no further orders, and any steps taken by it in the case are of no effect. — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — — A change of venue not only absolutely divests the court from which the case was removed of jurisdiction, but it also clothes the court to which removal is had with the same jurisdiction that reposed prior to the change in the court of original venue." See also: 12 Tex. Jur., p. 493, sec. 195.

While no case has been called to our attention—nor have we been able to find a case—wherein the rule stated has been directly followed by this court, yet in Webb v. State, 133 Tex. Cr. R. 32, 106 S. W. (2d) 683, an expression is found to the effect that an order changing venue vests jurisdiction in the court to which the venue is changed.

Likewise, in Seaton v. State, 29 S. W. (2d) 375, 115 Tex. Cr. R. 175, it is stated: "A mistake of the trial judge in exercising his discretion to change the venue does not affect the *jurisdiction* of the court to which the transfer has been made."

On the other hand, there are cases where the order changing venue did not effect a transfer of jurisdiction. This was announced in Hollingsworth v. State, 87 Tex. Cr. R. 399, 221 S. W. 978, where the order changing the venue was held ineffectual to transfer jurisdiction because the indictment had been lost and no substitution thereof had been made before the venue was ordered changed, the indictment or a substituted copy being necessary to the jurisdiction of the court making the transfer.

In the light of the rule stated, and the cases mentioned, the conclusion is reached that, where a court having jurisdiction of the person and subject matter of one accused of a felony, by order changes the venue of the case, under and in accordance with the applicable statutes of this State, such change carries with it, and confers upon the court to which the venue is changed, full and complete jurisdiction of the case.

Having so concluded, the next question presented, then, is whether the Judge of the District Court of Bowie County was authorized, under the circumstances here shown, and at the same term of court, to set aside and thereby nullify the order changing the venue to the District Court of Red River County.

It is the general rule that a trial court has full power and control of its judgments, orders and decrees, during the term at which they have been made, and that, in the exercise of that power, he may, at the same term of court, correct, modify, or set them aside. 12 Tex. Jur., p. 736, sec. 566. Bankston v. State, 80 Tex. Cr. R. 629, 192 S. W. 1064. The rule stated has been recognized in cases involving notice of appeal. Under the express provisions of Art. 828, C. C. P., the giving of notice of appeal in a criminal case suspends and arrests all further proceedings in the case in the trial court, pending determination of the appeal, except to substitute lost papers or records in the case. Notwithstanding the statute mentioned, the trial court is empowered, under the general rule mentioned, at the request of the accused, during the same term of court, to set aside the notice of appeal. Ex parte Maple, 116 Tex. Cr. R. 383, 33 S. W. (2d) 734; Ex parte Wood, 129 Tex. Cr. R. 422, 87 S. W. (2d) 487.

An exception to the general rule, however, is recognized when the accused has accepted the judgment and has performed a part thereof, or has suffered some punishment as a result thereof, in which event the court is powerless to change the judgment in any substantial respect. Turner v. State, 31 S. W. (2d) 809, 116 Tex. Cr. R. 154, and authorities there cited. But, this exception does not extend to an order fixing bail in a capital case when the bail first fixed was made by the accused and thereafter the order fixing the amount of bail was set aside and the amount of bail was increased. Ex parte Reis, 33 S. W. (2d) 435, 117 Tex. Cr. R. 123.

In the instant case, no steps had been taken to carry out or to comply with the order changing the venue. The trial court certified that the order granting the change of venue had been "improperly" entered. In what particular the order was improper the record does not reflect. At any and all events, appellant's status remained the same.

In the light of the facts here presented, and the rule stated, the conclusion is reached that the trial court had the power to set aside the order changing the venue of the case.

It follows that the District Court of Bowie County had jurisdiction of the case, and appellant's contention to the contrary is overruled.

This brings us to a consideration of the case upon its merits.

The prosecutrix, Barbara Hibbs, is a 4 1/2-year-old white girl; the appellant, a 24-year-old-negro man.

The prosecutrix' parents operated a cafe and grocery in the City of Texarkana. Their residence was adjacent to, and only about fifteen feet from, the store building. On the night of July 2, 1942, the father and mother worked at the cafe until shortly after midnight (until about 1:00 A. M. July 3, 1942). Upon arriving home, they immediately looked for their three children, who, besides Barbara, were a 15-year-old daughter and a 2-year-old son. They found the two younger children asleep in one room. It appears that the older daughter occupied another room and that she had not retired. A short time later, the older sister thought she heard Barbara crying outside the house. She made an investigation and found that Barbara was not in her room. She communicated such fact to her parents, who in turn notified the sheriff and relatives, including the grandparents. The screen of the window to the room occupied by Barbara had been torn loose and pushed out.

Mrs. Beckham, who lived about 2 1/2 blocks from the Hibbs residence, said that she was awakened by a slight noise outside her window, which she investigated, and that she there found Barbara "sort of whimpering." She carried the child into her home and notified her parents. She described the child's condition and appearance as follows: "The back part of Barbara's gown was gritty, and her head was damp, the back part of her head. The shoulders of her gown had the most grit or dirt on it, — — — — — — — — — — — — — — — — — — — — — — — — — — — — At the time I picked her up, as to whether or not she was making any complaint to me, I would say she was kind of holding herself in here (indicating stomach,) in her stomach, and had her hands here in the stomach. Barbara's neck was all red and her mouth was red, all red around the mouth and her neck was red and she kept swelling an awful lot, and she couldn't talk. She seemed like she couldn't talk, and she seemed like she had been choked. Before she left my house and while she was there she was not able to say anything to me at that time at all, and she seemed like her neck was kind of hurting her."

The grandfather, accompanied by the sheriff and another party, answered Mrs. Beckham's call and carried Barbara home.

It does not appear that Barbara made a statement to the parties on the way back home. Upon arrival at home, and in

answer to questions, she made the following report and statements:

She was asked who carried her away, and she replied that it was "an old boy." To her father, she said it was "The boy that cut the grass"; that "he got on top of her, and laid down on her"; and that he "carried her by her head." She complained of her stomach being sore and of hurting between her legs.

Within about two hours after Barbara arrived back home, a doctor made a physical examination of her. As to her condition, he testified: "She had scratch marks on the left side of her neck and shoulder, and was very sore on the left side of her shoulder and neck. She was very nervous and hysterical. I had occasion to examine the private parts of the female child. There was quite a marked redness and swelling and a few little scratch marks. The redness and swelling on her private organs was quite definite. It was definite and marked. The swelling and redness extended beyond the two lips of the vulva of the female child. It extended to the opening of the vagina. There are two lips of the vulva, the female organ, and this definite and marked swelling and redness extended beyond the two lips of the vulva." The doctor expressed the opinion that the condition found by him could have been caused by the sex organ of a male person. Upon cross-examination, the doctor testified: "I cannot state here, under oath, and cannot positively swear that in my opinion there was positive penetration of the private organs of little Barbara Hibbs by the male penis of a human being. I cannot swear that."

The State introduced the following confession of the appellant: "I, Mat Williams, being in custody of Mr. Monroe P. Watts, Sheriff of Bowie County, Texas, having been first warned by Mr. R. L. Lattimore, Jr., Assistant County Atorney of Lamar County, Texas, the person of whom the hereinafter set out statement is by me made, that I do not have to make any statement at all, and that any statement made by me may be used in evidence against me on my trial for the offense concerning which this statement is made, do here make the following voluntary statement in writing to the said Mr. R. L. Lattimore, Jr.

"My name is Mat Williams. I am 24 years old. I live at DeKalb, Texas. On Wednesday, July 1, last Wednesday, I mowed a yard at Mr. Hibbs house on the New Boston Road in Texarkana, Bowie County, Texas. While I was cutting the yard a

little girl who looked to me like she was something around two years old or maybe older was playing around the yard and she carried some water out on the porch for me to drink. I didn't know her name at that time but I knew she stayed there at the house where Mr. and Mrs. Hibbs stayed, and I learned since that her name was something like Barbara Hibbs. I asked her to go after some Camel cigarettes at the store next to the yard. I was cutting and her mother was in the store and she brought the cigarettes out and handed them to the little girl and the little girl brought them to me. Later after I finished the yard and got paid the little girl's mother took 20 cents out of the dollar that I got for cutting the yard and gave me the rest of the change. After that on the same day I cut another yard across the road from Mrs. Watts house and I also helped another boy on the front of Mrs. Watts yard, and the next day I came back and finished cutting it. That night, Thursday night, sometime late I went back to the Hibb's house and cut a screen on the window but I quit that and went around and pulled open the back screen door, it wasn't locked, and went in the house after some bread and the little girl was in bed and she started crying and scared me so I picked her up and carried her out of the house and put her down beside the road. Then I went on over to Newtown and went to bed with a girl named Tempy then I got up and later that night I went on down by my brother Lemuel's house and then I went on up to Mr. Kidd's Dairy Ice plant and layed down about an hour and then one of his hands woke me up and wanted me to go down and work for his brother who was kinda sick and I did that and delivered ice all day yesterday, Friday. Yesterday about the middle of the afternoon I heard that the laws were looking for me, my sister-in-law told me, her name is Eronora, and last night I went out to the nigger swimming hole with two boys and stayed all night and this morning I was walking on back towards Texarkana and a man caught up with me and told me he was the law and he took me on to Texarkana and turned me over to Sheriff Watts."

There was testimony that, on the day previous to the alleged offense, the appellant had mowed the lawn at the Hibbs home.

Barbara Hibbs did not testify as a witness in the case. No explanation of her failure to testify was made, except such as arises by reason of her age.

The foregoing constitutes a statement of the State's testimony, and it is made to appear therefrom that the State de-

pended, for a conviction, upon the declarations of the prosecutrix, her physical condition, and appellant's confession.

Appellant, testifying as a witness in his own behalf, denied the crime or any connection therewith. He denied that he carried the child out of the house or that he in any manner mistreated her. He denied the statements contained in, and the voluntariness of, the confession, and asserted that it was made only after he had been mistreated and beaten by the officers. He testified to the affirmative defense of alibi, and was supported, in that defensive theory, by the testimony of other witnesses.

This statement of the facts is deemed pertinent in view of the matters hereafter discussed.

This brings us to a consideration of the trial court's failure to change the venue of the case, upon appellant's application, which appellant urged both before announcing ready for trial and after the conclusion of the testimony, with reference to which, in addition to what has heretofore been stated, the record reflects the following:

Appellant was arrested the day following the alleged offense. He was immediately thereafter, by the sheriff, carried to Paris, Texas, a distance of about 90 miles, and there placed in jail for safekeeping, because as the sheriff testified: "From my knowledge of existing conditions at that time, I think there was a possibility of mob violence." Appellant was kept in the Paris jail continuously until the day of trial, except for a short time on the occasion of the drawing of the venire in this case.

The indictment was returned and filed July 10th, 1942, and three days thereafter a negro man by the name of Will Vinson, who was alleged to have criminally assaulted a white woman, in Bowie County, was, by a mob, at night, forcibly removed from a hospital in the City of Texarkana, dragged through the streets, and hanged to the winch of a gin stand platform in the city. A Texarkana newspaper, in large type, carried the heading, "NEGRO LYNCHED. BY MOB HERE," and, in smaller type, "Hanged by a small band after being dragged through city streets." The newspaper article carried an account of the hanging and of the nature of the assault alleged to have been committed.

It was four days after the hanging of Will Vinson that the trial court entered his order transferring the venue of the case, and seventeen days thereafter this case went to trial.

The actual trial of the case occurred under the following condition: The courtroom, as well as the corridors of the courthouse were crowded with people. All doors to the courtroom were closely guarded by officers. Only such spectators were admitted to the courtroom as received the approval of the court or the sheriff. From one spectator who was searched a large dagger was taken. At different places in the courtroom during the trial there were stationed and constantly in attendance some fifteen peace officers and five Texas Rangers. In a room adjoining the courtroom, and near the judge's stand, there were a shotgun, three rifles, three machine guns, and some tear gas bombs. A deputy sheriff was at all times stationed at the door to this room. If these weapons were visible to the jury, the record does not so reflect. A Ranger Captain was at all times seated near the appellant.

According to the testimony of the sheriff, no such precautions as used in the trial of this case had ever before been employed or found necessary to secure the safety of one upon trial for crime in Bowie County. These precautions, the sheriff insisted, were for the purpose of protecting the appellant and of seeing that he received a fair trial.

Our Bill of Rights (Art. I, Sec. 10, Texas Const.) guarantees to every person a fair and impartial trial. This guarantee is one of the fundamentals upon which rests the perpetuity of this government. It is the duty of the courts to preserve and to maintain that right, and this regardless of how heinous or revolting the crime committed may be.

No one should be condemned to suffer the penalty of death until and unless he has been first tried and so adjudged in accordance with law. The accused is entitled to a fair trial, by an impartial jury, and there is no other method provided by which one can be lawfully punished for crime.

If there exists in the mind of this court any doubt as to the fairness or impartiality of the trial, it becomes our duty to award a new trial. Without singularizing any one particular fact, but considering all the facts and circumstances shown by this record, there does exist that doubt.

The trial court and the sheriff are to be commended in their efforts to protect appellant and to secure his safety, at all times, during his trial; but, the necessity of the precautions here employed by the sheriff to secure that safety militates against the

idea of a fair trial, for, as we said in Mickle v. State, 213 S. W. 665, 85 Tex. Cr. R. 560, "It appears to us that if public sentiment was such as to necessitate the course of conduct above outlined on the part of the officers of the law, it is difficult to believe that at that time and under those circumstances the accused could obtain that fair and impartial trial which is the proud boast and the guaranteed right of all of our citizens."

From what we have said, it follows that we are of the opinion that the venue of this case should have been changed. In support of. this conclusion, attention is called to the cases of Sorrell v. State, 74 Tex. Cr. R. 505, 169 S. W. 303; Massey v. State, 31 Tex. Cr. R. 371, 20 S. W. 758; Liggon v. State, 82 Tex. Cr. R. 514, 200 S. W. 530.

In view of another trial, we deem it pertinent to discuss certain other questions presented by this record.

Appellant objected to the receipt in evidence of the statements and declarations the prosecutrix made to the mother and father after her return home. The objection to this testimony was that it was hearsay and prejudicial. The State insists that the statements and declarations were a part of the res gestae, and were, therefore, admissible, as res gestae overrides the rule of hearsay. Appellant insists that the statements and declarations were not res gestae, in that they were lacking in that spontaneity necessary to constitute res gestae, and that, if they were res gestae, they were inadmissible because they were made by and came from one incompetent to testify as a witness in the case.

The questions presented for our determination are thus clearly drawn, and may be stated as follows:

1. Were the statements and declarations a part of the res gestae?

2. Are the res gestae statements and declarations of one incompetent to testify as a witness admissible as evidence?

We discuss these in the order named.

Whether a given statement or declaration is or is not a part of the res gestae depends, of necessity, upon the particular facts of each case. No fast or hard rule relative thereto has been or can be laid down. Time, that is, the time elapsing between the

happening of the event and the making of the statement or declaration, is not, alone, controlling. Nor does the fact that the statement or declaration is made in answer to a question propounded necessarily destroy it as res gestae.

The controlling factor, in determining when a statement or declaration is or is not a part of the res gestae, as pointed out in recent case of Trammell v. State, 167 S. W. (2d) 171, is that of spontaneity, which takes the statement or declaration out of the realm of narration of a past event, or premeditation. If the act or declaration is spontaneous so as to constitute the act speaking, it is a part of the res gestae. If the statement or declaration is that of the witness speaking about or narrating the facts, it is not a part of the res gestae.

With these rules in mind, we look to the circumstances under which the statements and declarations were made.

Here, a 4 1/2-yera-old-girl is, in the dead hours of night, forcibly removed from her home and bed. Shortly thereafter, she is found outside and near the residence of a neighbor, crying. She has been  bruised, choked, and assaulted by someone. The condition of her neck and throat is such that she cannot talk to the person who finds her. She is, within a short time after she is found, carried home to her parents. To those who carry her home she does not talk. Upon arriving home, and when her mother and father make inquiry, she, for the first time, makes the statements and declarations as to what has happened to her, and who her assailant is. A child of the tender age of this one could hardly be charged with knowing the nature, extent, or seriousness of what has happened to her, or of the crime perpetrated. The natural and human thing for a child of the age of the prosecutrix to do, under the same circumstances, is to do as the prosecutrix did on this occasion, that is, in childlike manner, tell her parents what had happened to her. The fact that prosecutrix was not more definite or explicit in her statements and in the identity of her assailant tends strongly to disprove the idea that what she said to her parents was the result of thought or premeditation, but, to the contrary, demonstrates that what she said was the act speaking through her.

The conclusion is reached that the statements and declarations so proven were a part of the res gestae and were admissible as such. In support of this conclusion, attention is called to the following cases: Thomas v. State, 84 S. W. 823, 47 Tex. Cr. R. 534; Kenney v. State, 79 S. W. 817, 65 L. R. A. 316;

Watkins v. State, 180 S. W. 116, 78 Tex. Cr. R. 65; Jenkins v. State, 27 S. W. (2d) 164, 115 Tex. Cr. R. 53; and Sanders v. State, 75 S. W. (2d) 116, 127 Tex. Cr. R. 55.

In the record before us, it is not clear whether the statement by prosecutrix, as testified by the sheriff, was made to him at the same time as those made to the parents, or whether same was made subsequent thereto. Attention is called to the holding in the Sanders case, supra, that subsequent statements to officers may not be a part of the res gestae.

This brings us to a consideration of the second question.

Upon the trial of this case, the State made no effort to offer the prosecutrix as a witness. The presumption is that she was incompetent to testify.

Although there are cases from other jurisdictions expressing a contrary view, it is no longer an open question in this State but that the res gestae statement of a child incompetent to testify as a witness is admissible in evidence. Croomes v. State, 51 S. W. 924, 40 Tex. Cr. R. 672; Kenney v. State, 79 S. W. 817, 65 L. R. A. 316; McPherson v. State, 182 S. W. 1114, 79 Tex. Cr. R. 93; and Watkins v. State, 180 S. W. 116, 78 Tex. Cr. R. 65.

The Kenney case, supra, is, in many respects, similar to the instant case. There the accused, a negro man, was convicted of rape upon a 3 1/2-year-old white girl. The child was incompetent to testify as a witness. The State introduced in evidence the declarations made by the child to her mother a short time after the commission of the alleged offense, which tended to show the guilt of the accused. After reviewing at length a number of authorities, this court held that the statements and declarations of the child were a part of the res gestae and were admissible, notwithstanding the incompetency of the child to testify as a witness in the case. The conclusion so reached is expressed as follow:

"Res gestae is not a witness. It cannot be summoned as a witness, nor sworn as a witness, nor put under the rule as a witness, nor punished for contempt or perjury as a witness. But it is a fact—an integral part of the transaction, occurring dum fervet opus—and, as a fact, it can be testified to by any competent witness who may have heard it, just as such witness may testify as to any other fact which transpires during the transaction, and which is and was a part thereof."

Judge Davidson, the then Presiding Judge of the Court, did not agree to the conclusion of the majority and filed a dissenting opinion. Later, however, in the Watkins case, supra (a rape case), Judge Davidson himself recognized that the holding of the majority in the Kenney case, supra, had become the established rule of law in this state. Attention is also called to the fact that, in that case, the female was 4 years and 9 months of age, and the statements made to her mother, which were in evidence, were made something like an hour or an hour and a half after the alleged crime.

Appellant contends that the confession was not free and voluntary, and that same was made under duress and as a result of physical violence by the officers having him in custody.

Inasmuch as the admissibility of the confession depends upon disputed issues of fact, which may not be the same upon another trial, we refrain from expressing an opinion as to the facts as shown by this record. We content ourselves with the suggestion that, upon another trial, the State explore all available evidence touching the issue, and especially that of all the officers who had appellant in custody at the time he claims to have been mistreated.

As to the sufficiency of evidence to support a conviction in a rape case where the prosecutrix does not testify, we call attention to what was said in the recent case of Vasquez v. State.

Other matters appearing will hardly arise upon another trial, and are, therefore, not discussed.

For the error pointed out, the judgment is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.