THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JOSÉ MÁRQUEZ, Defendant and Appellant.

No. 10610. Argued December 6, 1944.—Decided January 9, 1945.

*Cruz Ortiz Stella* for appellant. *R. A. Gómez, Prosecuting Attorney (Fiscal)*, for appellee.

Mr. Justice De Jesús delivered the opinion of the court.

José Márquez and Julio Delgado were charged with having raped Ana Adelina Cruz by having sexual intercourse with her by force and violence. They were tried together. The jury acquitted Delgado but found Márquez guilty, being sentenced to one and a half years' imprisonment at hard labor. Márquez appealed and assigned three errors of which, the one alleging that the verdict is not supported by the evidence and is contrary to law, we shall presently discuss, since in our opinion it is well grounded.

The prosecutrix, a girl who at the time the alleged crime was committed, was fourteen years and odd months of age, testified that she lived in the country at Naguabo; that on the day of the occurrence, about the 9th of August, 1940, she went together with two friends, Carmen García and Justina Molina, both younger than herself, to get some firewood at a place called La Peña in the ward she lived; that there they met Delgado, who entered into a conversation with her; that said defendant, touching her with the tip of a *machete* which he carried, told her, "I bet I can kill you!", to which she answered, "I bet you can not!"; that he said he could carry her on his arms and immediately thereafter took hold of her and carried her into the thicket, shouting to her friends to leave and threatening them if they said anything; that the friends withdrew a short distance, hiding in a place where they could see what they did to her; that while Delgado was carrying her she struggled, but that suddenly the other defendant, Márquez came out from behind the rock where he was hiding and that both laid her down on the

ground; that Delgado tied a handkerchief around her mouth and held her while Márquez had sexual intercourse with her; that after Márquez had finished he held her and kept the handkerchief on her mouth while Delgado had sexual intercourse; that when Delgado finished, both defendants ran away and warned her that if she told what had happened they would kill her; that she was very sad when she reached her home; that her clothes were in pieces and stained with blood, and that when her mother saw her and noticed that she walked with some difficulty, asked her what had happened and she told her that the blood came from the menstruation and that her feet were tired.

When Carmen García was called to the witness stand, she testified that she knew Ana Adelina Cruz and the defendants, whom she identified. Immediately thereafter, the following took place, as it appears from the record:

"Q. Speak loud. Do you know anything about this case?—A. Yes, sir.

"Q. Listen, say it loud, louder, and looking at those gentlemen [referring to the jury], what do you know about this case? Proceed.—A. We were in the hill in a solitary place, there were three of us.

"Q. Go on, go on, what happened? [The witness does not answer.]"

From that moment the witness felt ill and could not continue her testimony. The district attorney withdrew her while she recovered and called Justina Molina.

After stating where she lived, Justina Molina testified as follows:

"Q. Do you know Ana Cruz? Speak out loud, child.—A. I know her.

"The Court: Can you speak a little louder? Listen, speak as loud as you can, slowly, addressing these gentlemen, slowly. All you have to do is to state the truth, don't worry, go ahead.

"District Attorney: Do you know Carmen García?—A. Yes, sir. I know her.

"Q. Do you know Julio Delgado?—A. I know him.

"Q. Of these two men who are present, which one is Julio Delgado?—A. The one on that side.

"Q. The one in his shirtsleeves?—A. Yes, sir.

"Q. Do you know José Márquez?—A. Yes, sir.

"Q. Which one is he?—A. The one dressed in blue.

"Q. How do they call José Márquez, José Peña?—A. They always call him José Peña.

"Q. Child, do you know anything about this case?—A. I know nothing about this case. I only saw them talking.

"Q. Speak louder. You saw them what?—A. I saw José and Ana Cruz talking and I called Ana Cruz to go home, and then she refused to go and I went home and left them there. I do not know what happened there.

"Q. Where were you going?—A. Nowhere. We were under a tree.

"Q. Who were under a tree?—A. Ana Cruz and I.

"Q. Who else?—A. Carmen García.

"Q. Where were you before you went to that tree?—A. At home, we went out looking for firewood.

"Q. About what time was that?—A. I do not remember.

"Q. Was it in the afternoon, morning, or noon?—A. The afternoon.

"Q. What happened to Ana?—A. I do not know what happened to Ana.

"Q. Did you see Julio Delgado?—A. No, sir.

"Q. Did you not see Julio Delgado there?—A. I did not, but I saw José Márquez.

"Q. Don't you remember having testified that now?—A. I do not remember. I saw them; I say that I saw José and Ana Cruz talking.

"Q. And did you not see Julio Delgado?—A. No, I did not see Julio Delgado."

The district attorney tried to impeach the testimony of Justina Molina calling her attention to what she had testified under oath during the investigation of the case. Justina explained why she was testifying now in a different manner than she did during the investigation. She stated that she had testified as she did during the investigation at the request of Ana Adelina's mother, who had induced her to testify in that manner, had taken her to testify without her parent's

consent, and had even offered her a gift if she testified in that manner, but truly, she did not know what had happened.

When Altagracia Figueroa, Ana Adelina's mother, was called to the witness stand, she testified that on the day of the occurrence her daughter had gone out with two friends to get some wood; that she returned late with her dress torn and stained with blood, and that she noticed that her daughter walked with some difficulty; that when she asked what had happened her daughter answered that her feet were tired, and when asked about the blood stains she stated that they were caused by the menstruation; that she believed her daughter, undressed her, and gave her a warm bath; that her daughter kept bleeding for five more days; that on August 16, 1940, José María Cruz, Adelina's father, while passing on the road by a group of persons made up of Delgado, Márquez and others, heard when Delgado and Márquez stated "that Ana was a fool, that they had abused her"; that when Cruz heard this he returned home and told her what he had heard and asked her to inquire from her daughter as to this matter; that when she spoke to her daughter about this, she told her what had happened with the defendants in the place La Peña to which we have already referred in connection with the testimony of the injured girl.

José María Cruz testified what he had heard Delgado and Márquez state; that he told it to his wife as she had testified, and then he returned to the place where he had heard the alleged statements from Delgado and Márquez, and addressing the former he asked him what had happened with his daughter; that Delgado did not reply, but turned around and walked away; that he then told him that he was going to the police to have an investigation made, to which Delgado answered: "No, are you going to accuse me only?" to which Cruz replied: "More than one committed the crime." Cruz went to policeman Gierbolini who took him to the district attorney's office, and on the next day Cruz took his daughter to Dr. Mejías to be examined.

Dr. Mejías testified that on August 17, 1940, he examined the genital organs of the prosecutrix and found that she had been completely deflowered and when asked by the court, he answered that he could not state exactly the date when the defloration took place; that when there is a recent defloration, the genital organs generally show during the first ten days a swelling of the lips and scars which are not healed, and upon examining the patient she generally feels great pains; that in the case of Ana Adelina Cruz, the hymen was completely healed; that she felt no pain on being examined and that two fingers could be introduced in the vaginal canal without feeling any pain. The expert further testified that a recent defloration was, in his opinion, one which had been realized within eight days and on being asked by the district attorney if after eight days a defloration be healed, the doctor answered: "Yes, sir, it is almost what we call healed, but it is not. . . . ."

After the introduction of this evidence, the district attorney rested and announced that Carmen García could not testify because she was in a state of prostration. By direction the marshal went to find out whether she could testify, and on his return reported that the witness was very nervous and unable to testify.

The defendant presented a motion for nonsuit which was denied, whereupon he proceeded to introduce his evidence.

The first witness was Fernando Ubiles, who stated that he had seen Márquez and Ana Adelina Cruz on various occasions having sexual intercourse near the place where the rape was alleged to have been committed, and that at other times he had seen them together in the river naked.

Márquez testified that he knew Ana Adelina Cruz since she was a small child; that after she grew up she had been hired in Santurce but had gone back to her home in June 1940; that very often the defendant said "Good bye!" to her and made love to her; that on a certain occasion Ana Adelina Cruz was going to the clinic at the sugar mill to

have a small bruise cured, and that since he was going in that direction he went along with her; that he continued to make love to her and invited her to a matinee; that she accepted the invitation and on their return home, since the busses were late he took her to her house; that he caressed her several times without any objection on her part; that on the next day he went bathing while she was alone washing in the river, and that she called him; that he came to her and she told him that she had a secret; that she asked him not to spread it; that while she had stayed in Santurce "a man had abused her"; that after she told him the secret he asked her to have sexual intercourse with him to which she consented; that it was on that occasion when they first indulged in it; that subsequently they met quite often; that some times she called for him at the farm where he lives; that as a rule they met in the same place where she washed, and thus they had sexual intercourse five or six times; that once after having sexual intercourse they went bathing naked; and that they continued to have sexual intercourse until the beginning of August. He denied that he had raped her and insisted that whenever they had had sexual intercourse she did it willingly, so it was unnecessary for him to rape her.

Delgado, the other defendant, testified that he had never had sexual intercourse with Ana Adelina Cruz; that he made love to her and that on a certain occasion she proposed to elope with him, but he refused, asking her to wait until he could afford to rent a room for them; that that was as far as his relations went; that what Ana-Adelina Cruz testified in regard to the rape was untrue.

Such was the evidence before the jury.

There is no doubt whatsoever that Ana Adelina Cruz had been deflowered. She testified that both defendants had ravished her. If in a rape case the sole testimony of the prosecutrix, believed by the jury, sufficed to support a conviction, the evidence in this case would be satisfactory. But

the law requires that the testimony of the prosecutrix in cases of rape be corroborated. Code of Criminal Procedure, § 250. In rape, like in cases where corroboration is required to make the testimony of an accomplice admissible, the corroborating evidence need not prove all the elements of the crime; but it must tend to connect the defendant with the crime. *People* v. *Maldonado,* 17 P.R.R. 22; *People* v. *Vázquez,* 40 P.R.R. 245; *People* v. *Feliciano,* 53 P.R.R. 402. In certain offenses, especially in cases of rape, in order to connect the defendant with the commission of the crime it has been held in some jurisdictions of the United States that spontaneous statements made by the prosecutrix to other persons at the first opportunity with respect to what the defendant had done to her are admissible in evidence. That is the prevailing doctrine in this jurisdiction. *People* v. *Maldonado, supra; People* v. *Anglada,* 20 P.R.R. 11; *People* v. *Arenas,* 39 P.R.R. 14; *People* v. *Munera,* 39 P.R.R. 267; *People* v. *Blanco,* 40 P.R.R. 122; *People* v. *Vázquez, supra; People* v. *Fuentes,* 63 P.R.R. 42.[1]

---

[1] It seems advisable to explain here certain statements made by this court in the following paragraph of its opinion in *People* v. *Fuentes, supra,* p. 46:

"Irrespective of the statement made by the girl to her mother five days after the commission of the crime, we are of the opinion that the testimony of her mother and that of the physician are sufficient to corroborate the testimony of the prosecutrix as to the criminal assault perpetrated upon her."

The testimony of the mother, regardless of what the girl told her was to the effect that on the day of the crime she saw the defendant looking out of his room's window—close to the prosecutrix apartment—while the witness was in the backyard where she had gone while her daughter took a bath; that when the witness returned to the house she found her daughter sitting in a corner reading and looking over some pictures; and that on the 6th of July she started to wash some of the girl's clothing and found them stained with blood. All that the physician's testimony showed was that when he examined the girl on July 8 he found that she had been deflowered and that the hymen was still in process of healing.

The paragraph in question, which besides being erroneous, was unnecessary for the decision of the case, should be considered as stricken out, inasmuch as the testimony of the mother, irrespective of the statements made by her daughter, and that of the physician, do not connect the defendant with the commission of the crime.

The corroborating evidence introduced in the present case tending to connect the defendant with the commission of the crime consists of: (1) the testimony of the prosecutrix's mother as to what her daughter told her on August 16, 1940, when the father came to the house and told them what he had heard Delgado and Márquez say; (2) the testimony of José María Cruz as to the confession made by Delgado and Márquez on the same day, August 16, to the effect that Ana Adelina Cruz was a fool because they had abused her. The testimony of the prosecutrix's father regarding the alleged confession made by the defendants, if believed by the jury, would be sufficient to connect the appellant with the commission of the crime. But since the court, over defendant's objection, also admitted in evidence the testimony of the mother of the prosecutrix concerning the statements of her daughter on August 16, if this part of the testimony of the prosecutrix's mother is inadmissible, then it is impossible to determine whether the jury upon reaching a verdict of guilty did so because it believed the testimony of the prosecutrix's father as to the confession of the defendants or because it believed this portion of the mother's testimony. Therefore, we must determine whether the testimony of Altagracia Cruz with respect to the statements of her daughter on August 16 is admissible.

The spontaneity of the statements made by the victim is an essential element for the admissibility of the testimony. As a general rule, the statements made by the prosecutrix in answer to questions put by a third person who testifies concerning the same, are not considered spontaneous and consequently are not admissible in evidence; but this rule is not an inflexible one and in certain cases when the appearance of the clothing or of the offended person induces a third person to inquire and she is merely asked what is the matter with her and in response thereto she complains or makes statements, and in cases of a child of tender age or of adults mentally disabled, said statements made without

duress are admissible, even though the fact that the statements were made in answer to questions should be considered in the weighing of the evidence. Whether a certain statement or declaration is admissible necessarily depends on the special circumstances of each case. *People* v. *Fuentes, supra; State* v. *Ellison,* (N. M. 1914) 144 P. 10; *State* v. *Dudley,* (Iowa 1910) 126 N. W. 812; *Lewis* v. *State,* (Miss. 1938) 184 So. 53; *Conger* v. *State,* (Tex. 1911) 140 S.W. 1112; *Williams* v. *State,* (Tex. 1943) 170 S.W. (2d) 482. Nor is it an inflexible rule as to requisite that the complaint be made at the first opportunity, since in every case it depends on whether the surrounding circumstances prevented the person from making it at an earlier date. *People* v. *Blanco, supra.*

In the present case, as we have seen, immediately after the prosecutrix reached her home on the day of the occurrence, when the mother noticed that she walked with difficulty and that her dress was torn and stained with blood, she asked her daughter what had happened, to which she answered that the blood stains had been caused by her menstruation and that she walked with difficulty because she was tired. At this opportunity the outraged girl could have disclosed to her mother what had happened to her, and those statements would have been admissible in evidence. But eight days elapsed and the offended girl kept silent, until upon being asked again by her mother because of what the father heard from the defendants, she told a completely different story this time accusing both defendants. In our opinion, the latter statement of the prosecutrix is not the spontaneous statement contemplated by said rule. It is true that according to her testimony the defendants had threatened to kill her, but it does not appear from the evidence that after the offense she remained under their influence. There is no showing in the record that she saw them at any subsequent time, but, on the contrary, she remained with her parents from whom she had nothing to fear.

This case can be distinguished from that of *People* v. *Fuentes, supra.* In the latter case the victim was a girl of thirteen and a half years of age, who while being raped was threatened by the defendant so that she would not scream, telling her that he had a dagger, and that it would be worse for her if she told her parents about it. Even after the occurrence she saw the defendant again from a distance and he motioned her to keep silent, thus keeping her under the original threats. Notwithstanding said threats, six days after the crime was committed, when the mother found the girl's clothing stained with blood, she asked what had happened and the girl then told her mother what the defendant had done to her.

The present case is also distinguishable from *People* v. *Blanco, supra.* In said case the victim was a girl of tender years who lived with an aunt and the husband of the latter, the defendant, in the city of San Juan. The girl was raped by her aunt's husband and she complained to her aunt; but the latter threatened to kill her if she told anyone else what had befallen her. Under these conditions a year or more elapsed during which the defendant repeated his offense on the child who was induced to silence by threats of physical violence. The mother and sister lived in Ponce. The child could not write and there was no one through whom she could inform her mother and sister; but a year after the commission of the offense, her sister came to San Juan and immediately upon meeting her the offended girl voluntarily told her what the defendant had done to her. At the trial the testimony of the sister with respect to the statements made to her by the offended girl, were admitted over the objection of the defendant, and this court affirmed the judgment because notwithstanding the time elapsed between the commission of the offense and the complaint to her sister, the prosecutrix had made the statements at the first opportunity she had under the circumstances.

 In the case at bar, in view of the fact that the prosecutrix did not voluntarily make at her first opportunity the statements which incriminated the defendants, said statements do not come within the exception to the hearsay rule and, therefore, are not admissible in evidence. Since the defendant was tried by a jury, we should presume that such an important piece of evidence was prejudicial to him, as it is impossible to determine whether, upon convicting him, the jury based its verdict, wholly or in part, on the inadmissible evidence. *People* v. *Feliciano, supra.* Cf. *The United States* v. *King et al.,* 48 U. S. 832; *Sinclair* v. *United States,* 279 U.S. 749; *Swepston* v. *United States,* 251 F. 205; *Biggs* v. *State,* (Tex. 1929) 23 S.W. (2d) 729; *Birmingham* v. *State,* (Wis. 1938) 279 N.W. 15, 116 A.L.R. 554; and *People* v. *Jorczak,* (Ill. 1937) 9 N.E. (2d) 227.

Since it was prejudicial error to receive inadmissible evidence over defendant's objection, the verdict is contrary to law and consequently the judgment appealed from will be reversed and the case remanded to the lower court for a new trial.