Joseph **RODRIGUEZ**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–89–00332–CR.

Court of Appeals of Texas,
San Antonio.

Oct. 3, 1990.

Discretionary Review Granted
Jan. 30, 1991.

Stephen V. Davis, San Antonio, for appellant.

Fred G. Rodriguez, Wende Rush, Diana Cruz, Daniel Thornberry, Crim. Dist. Attys., San Antonio, for appellee.

Before BUTTS, REEVES and PEEPLES, JJ.

## OPINION

BUTTS, Justice.

This is an appeal from a conviction for aggravated sexual assault of a child. A jury found appellant guilty and assessed punishment at 20 years' imprisonment.

Appellant urges four points of error. The first two are that the trial court abused its discretion in (1) ruling the child was competent to testify, and (2) in permitting the child complainant to testify by closed circuit television. In his third point appellant argues the hearsay testimony of the outcry witness, which recited details of the alleged criminal offense, was erroneously admitted. The last argument is that no evidence supports the verdict, and the trial court erred in refusing to direct a verdict of acquittal.

All of the contentions on appeal will be examined in light of the hearsay testimony of the outcry witness, the mother of the child complainant. Before trial the State designated her as the outcry witness and notified appellant, furnishing him a copy of her statement. *See* TEX.CODE CRIM PROC.ANN. art. 38.072 (Vernon Supp. 1990). The child, not quite six years old at the time of the alleged offense on February 15, 1989, lived with her mother, Connie Lopez, and her brother and sisters in the Sutton Homes Project in San Antonio. Also living there were a teen-age brother and sister of Connie. Another brother and others lived there from time to time. According to some witnesses, the appellant stayed there in the past. Connie was not married. Appellant was married but separated from his wife at the time of this incident.

On that night Connie worked in a carnival games booth at the rodeo. She testified that she arrived home around 11:00 p.m. and could see into the bedroom. She related that appellant, fully clothed, was sitting on the bed and the complainant, wearing panties, was sitting beside him.[1]

---

1. There was testimony from other witnesses that the child was often observed around the

The mother said she did not notice anything wrong and continued on to the bathroom. She said the child followed her and reported that appellant had been "messing" with her. She testified the child told her "it hurt". Asked if the child expressed the word "messing" with her, she answered: "That he had been touching her." Connie stated the girl said he had been touching her between her legs. She said, yes, the child had pointed to the part of the body she was talking about. She said the child pointed to her vagina. The prosecutor asked: "And she calls that area between her legs—is that what she calls herself, calls that part of her body (vagina)?" "Yes." She said the girl was crying. Asked, "Did she say it hurt her?", Connie answered, "Yes, she did." Asked, "Did she ever say what he was touching her with?", she answered "Yes, she did. She told me that he was touching her with his pee-pee...." "She told me that he didn't take his clothes off, that he just unzipped his pants a little."

Connie said that appellant had left in the meantime, asking her to tell her brother to pick him up after he came home from work. Appellant went to his mother's apartment, a couple of doors away. Connie said her brothers went to talk to appellant later, but he was in bed and did not talk with them. Connie called the police.

In answer to the question, "Did she say anything with regards to her legs, that he made her do anything with her legs?", Connie said: "No. She told me that he wanted her to open her legs and that she told him no and that he forced her legs open." "And after he forced her legs open, then what did he do?" "I guess that's when he started messing with her." Connie stated that she saw that the area "was all red. Her vagina was all red."

About 4:00 a.m. the following morning Connie took the child to the emergency room of the Bexar County Hospital, where a resident doctor examined the little girl. Dr. Lisa Ann Turner testified that she found no sign of trauma, and the hymen was intact. The examination revealed no semen, no penetration, or any other sign of sexual assault. When asked if the child complained to her about hurting in her vagina, the doctor answered: "This was given to me in history from her mother. She [the child] didn't say anything to me." She agreed with various surmises of both the defense and the State that a few drops of "green fluid" found near the vaginal opening could have come from the girl's vagina, or from lack of hygiene, or from discharge of a penis. Although the doctor suspected this was a discharge indicating venereal disease, even after tests she could not identify the green fluid or its origin.

When asked to give her medical opinion about sexual abuse in this case, she answered: "I would have to say I couldn't be sure. That it was possible sexual abuse had occurred. It is possible that it hasn't." We note that to this point at trial the only evidence of sexual assault had come from the outcry witness, the mother. There was no supporting or corroborative medical evidence.

Laura Gruener, a child protective specialist with the Texas Department of Human Services, testified that she had investigated the case, interviewing the child complainant on February 17th. She said she was able to communicate with the child "only to a small degree" when she tried to record the interview on video tape. The child would only shake her head yes or no, refusing to verbalize. When shown anatomically correct dolls, the child, on being asked what she called the female doll's genitalia, "she would—seemed like she shrugged. She wouldn't name them." When asked about the male doll's penis, "she got up and looked worried or frightened toward me and inched along the wall ... and then walked to the door and opened the door and walked out of the room."

The social worker testified she then took the child to another room, brought in her

project wearing panties. The mother stated that her children wore to bed whatever clothes they wore that day. The evidence showed that on the night of the alleged offense, some of the children were asleep on the floor and others on the couch, and the television was still on. There was no evidence as to what the complainant was wearing when she went to bed.

mother and sister, and talked with her. In answer to a question whether the child named a perpetrator, she said the child did. Appellant's objection that this was "just another way of getting into hearsay as to what [the child] said ..." was overruled. The social worker then stated that the child named the appellant. She said she called the appellant and arranged an interview. She testified he told her he had gone to sleep watching television at the apartment and when he woke, the complainant and her sister were in bed with him. He denied committing the offense.

Appellant objected that he should be allowed to show a previous sexual referral to the Department involving the same child, which this social worker investigated. Counsel stated:

> We have not got to see the child herself testify, and all we have is something very second hand, and the only incident of the child really telling the story is really [the child] on the lap of her mother who probably chipped in all the details.

> You have seen how [the child] testified. All she could do really is nod her head.... Her mother could have fed that whole story to the ... Department ... We have this similar type of thing happening before, a similar story. She reported the sexual assault incident and nothing—it came to nothing. Similar accusations.

> THE COURT: It came to nothing because the child ... according to this woman's (social worker) testimony because the child wouldn't say anything, *which is a different circumstance in this case.* (Emphasis supplied) [Evidence of the earlier alleged sexual assault accusation was excluded; this is not a point on appeal.]

The appellant testified, telling of a sexual relationship between himself and Connie. He said he ended the affair because he wanted to go back to his wife and baby son. It was the defensive theory that the charges were brought vindictively. Connie denied there was any such relationship. She denied that she had a motive for bringing these charges. She did acknowledge appellant sometimes spent the night at her apartment, but said it was with her brothers. She said they would smoke pot or sniff spray paint, and she would throw them out.

Appellant testified he went to the apartment on the 15th of February to wait for Connie's brother to get off work so they could go out drinking. Appellant recounted he fell asleep watching T.V. and moved into the bedroom, lying down on the edge of the bed with all his clothes on, including a jacket. He said he did not know when the two children got into the same bed. He testified the sound of Connie coming in the back door woke him, and he got up. He said he met Connie at the back door, telling her to ask her brother to come get him when he got home, and then he went to his mother's apartment.

The State called Connie's 14 year old brother as a rebuttal witness. Moses Leal confirmed that appellant came to the apartment to wait for his brother. The last he remembered before going to sleep was that appellant was watching television. He said appellant was leaving the next time he saw appellant. "My sister called the police, and then I asked [the child] what happened, and then she said nothing. She said, 'It hurts.' That is all she told me." The only evidence in this case of the alleged sexual offense—the details to prove the truth of the event—was the hearsay testimony of the outcry witness, as related above.

The State relied on closed circuit television pursuant to TEX.CODE CRIM PROC.ANN. art. 38.071 (Vernon Supp. 1990) and the hearsay statement of the designated outcry witness pursuant to article 38.072 (Vernon Supp.1990) to establish the criminal offense.

### Article 38.072

Article 38.072 of the Texas Code of Criminal Procedure applies in cases of aggravated sexual assault committed against a child 12 years of age or younger. It provides in pertinent part:

> Sec. 2 (a) This article applies only to statements that describe the alleged offense that:

(1) were made by the child against whom the offense was allegedly committed; and

(2) were made to the first person, 18 years of age or older, other than the defendant, to whom the child made a statement about the defense.

(b) A statement that meets the requirements of Subsection (a) of this article is not inadmissible because of the hearsay rule if:

(1) [notice is provided to the defendant before trial by furnishing the name of the outcry witness and a written summary of the statement];

(2) the trial court finds, in a hearing conducted outside the presence of the jury, that the statement is reliable based on the time, content, and circumstances of the statement;[2] and

(3) *the child testifies or is available to testify at the proceeding in court or in any other manner provided by law.* (emphasis supplied)

TEX.CODE CRIM PROC.ANN. art. 38.072 (Vernon Supp.1990). This recent addition to Texas law permits the admission of hearsay testimony of the details and circumstances of the alleged criminal act by a witness (the outcry witness) other than the child complainant when all the requirements of the statute are met. *See Vera v. State,* 709 S.W.2d 681, 685 (Tex.App.—San Antonio 1986, pet. ref'd) as an example of prior law (hearsay testimony of details by outcry witness held inadmissible and case reversed).

The key words of article 38.072 are "the statement is reliable" and "the child testifies or is available to testify." A comprehensive discussion of the statute, including legislative intent, is found in the dissenting opinion of *Garcia v. State,* 792 S.W.2d 88, 94–95 (Tex.Crim.App.1990) (Clinton, Jr., dissenting). There it is noted that one of the primary reasons for the exclusion of hearsay from the jury is its lack of reliability. The purpose of the pretrial reliability hearing is to permit the adverse party to reveal to the trial court any reasons which might exist for doubting the reliability of the hearsay. *Id.* at 94.

However, the dissent points out:

*[E]ven if the trial court finds that the hearsay is reliable enough to be admitted as substantive evidence of the guilt or innocence of the accused, the statements remain inadmissible unless the child testifies or is available to testify, as required by § 2(b)(3) of the statute. By requiring the testimony or availability of both the speaker (the child) and the listener (the outcry witness), the adverse party is ensured the opportunity to highlight for the factfinder any contradictions about the statements through trial examination and cross-examination. Through these safeguards, what is otherwise rank hearsay can be more confidently admitted for the factfinder's consideration as reliable substantive evidence of the guilt or innocence of the accused.*

*Id.* (emphasis added)

There were objections to the child complainant's inability to testify after the State failed to obtain from her any evidence, even the slightest scintilla of evidence, of the alleged offense. The child, in fact, could not identify the appellant sitting in the courtroom. After the futile attempt by the State to question the child regarding the facts, appellant stated his objection, citing the child's incompetency to be a witness: "Your Honor, we have no questions, just an objection. We would ask ... the jury to disregard this testimony as coming from an incompetent witness. She shows obviously that she can't relate to anything that she is interrogated about." The court made no ruling, stating, "Well, we'll see." After the State failed to obtain testimony from the child, either that an offense had been committed against her or that appel-

---

**2.** The record does not disclose that a hearing for the purpose of determining the reliability of the outcry witness' statement was conducted, although a hearing on competency was conducted. Nor is there a ruling that the statement is reliable. This is not assigned as error on appeal.

lant committed any offense, in its case in chief,[3] the outcry witness testified.

■ Appellant objected to the outcry witness' testimony: "Again, we object, there being no direct testimony from the witness herself or the alleged complaining witness. If this is just an outcry witness, then it just constitutes pure hearsay." This was overruled. Although the objection might have been stated more artfully, we find this preserved any error necessary to challenge the hearsay evidence. We do not agree with the State that by permitting the outcry witness to continue to testify without further objection, appellant waived the hearsay objection. Nor do we agree that the objection was too general to preserve error.

■ Although defense counsel did not mention article 38.072, he did object and specify that the child did not and could not testify. All the pretrial and trial proceedings clearly show that the State relied on article 38.072 to present its case. The statute requires that the child complainant must either *testify or be available to testify*. The State attempted, without any success, to elicit testimony from the child. (*See note 3*) We also perceive appellant's several objections to the incompetency of the child witness as going to the child's indisputable inability to testify, contrary to the requisites of the statute. For even if a child does not testify, the statute mandates that she be *available to testify*. In this case the child was located in another room with closed circuit television showing her and any statements she might make. But depositing the complainant child physically nearby to be recorded on television, when she cannot testify, for whatever reason, simply is not enough to meet the requisites of article 38.072. If, as in the present case, it is demonstrated that the child does not have the ability to testify, either from an intelligence standpoint or for any other reason, she is not *available to testify* as required by this statute.

"Available" is defined in BLACK'S LAW DICTIONARY 123 (5th ed. 1979) as *suit-*

able; useable; accessible; obtainable; present or ready for immediate use.* We hold that the child complainant in this case did not testify to any evidence relevant to the guilt of appellant, nor was she available to testify as mandated by article 38.072, § 2(b)(3). Since the stringent requirements of the statute were not met, the hearsay statements of the outcry witness which were dependent upon article 38.072 for their validity were inadmissible under that statute.

■ However, that does not end our inquiry. Although the record bears out the State's reliance on article 38.072 at trial to prove the offense charged, the State now urges on appeal that statements of the outcry witness were admissible under the "excited utterances" exception to the hearsay rule. TEX.R.CRIM.EVID. 803(2). It is a well recognized exception to the general prohibition against hearsay evidence that statements made while in the grip of violent emotion, excitement or pain, and which relate to the exciting event, are admissible under the rationale that the capacity for reflection necessary to the fabrication of a falsehood is lost. *King v. State*, 631 S.W.2d 486, 491 (Tex.Crim.App.1982), *cert. denied*, 489 U.S. 1093, 109 S.Ct. 1563, 103 L.Ed.2d 930. *See* RAY, LAW OF EVIDENCE § 927, 1A TEXAS PRACTICE (3rd ed. 1980).

In this case the outcry witness could testify properly to the complaint as evidence only of the fact of the complaint, but in order to testify to the details of the event, that is, to testify to the truth of the matter asserted, the State must present some other evidence of the offense. Stated otherwise, the hearsay evidence of the outcry witness alone is not sufficient. While it has been written that it is established law that the "res gestae" statement of a child incompetent to testify as a witness is admissible in evidence, *Williams v. State*, 145 Tex.Crim. 536, 170 S.W.2d 482, 490 (1943), in those cases involving incompetent witnesses, there is an ingredient which is missing from the present case. That essential ingredient is proof of corroborating

---

**3.** Attached as Appendix to this opinion is the entire testimony of the child complainant.

evidence. In *Williams* the evidence showed the 4½ year old girl was found wandering at night over two blocks from home. She was "whimpering" and bruised. Her neck was red and swollen so that she had difficulty speaking. She told that her stomach and "between her legs" hurt. Her parents testified to this evidence of assault, as well as who the child said attacked her. A doctor testified that the child was nervous and hysterical upon examination, that she had scratches on her neck and private parts. He said there was a redness and swelling of the private parts which extended beyond the lips of the vulva.

There was similar independent proof in *Haley v. State*, 157 Tex.Crim. 150, 247 S.W.2d 400 (1952). In that case the 4½ year old girl had blood on her legs and clothing, and there was also a confession by the defendant. In addition, the doctor in *Haley* testified there had been a "recent act of intercourse" and the child's vagina was "dilated, torn and lacerated." *Id.* 247 S.W.2d at 401. In *Mills v. State*, 626 S.W.2d 583 (Tex.App.—Amarillo 1981, pet. ref'd), relied on by the State, the prosecutrix, apparently not a child, testified about the alleged rape. The outcry witness was properly allowed to testify to what the prosecutrix told him at her first opportunity. That is a different situation from the present case. The facts of the alleged rape came from that prosecutrix.

The court in *Richardson v. Green*, 677 S.W.2d 497, 500 (Tex.1984) noted:

> To be admissible as res gestae a statement must be shown to have been a spontaneous reaction to an exciting event, and there must be independent proof of the occurrence to which the statements relate; the statements themselves cannot be used to prove the exciting event.

The same court stated: "Evidence which establishes only that the event *could have* occurred does not satisfy the requirement; it must be sufficient to support a finding that it *did* occur." *Id.* at 501. (emphasis in original). *Richardson* involved proper proof of sexual abuse of a small boy, and

the court spoke to the proof required when excited utterances are employed to prove the truth of the accusation. In the present case there is no evidence, other than the statements by the outcry witness, that the charged offense happened. Nor is there any other proof that appellant committed the charged offense. Therefore, there is no independent proof to prove the exciting event occurred.

Before enactment of the present rules of criminal evidence, Texas law required independent proof that the exciting event had occurred, and the evidence had to be sufficient to support a finding that the event occurred. The wording of TEX.R.CRIM. EVID. 803(2) does not mention this limitation. Legal scholars point out that the rule may now be interpreted so that the declarant's own condition, such as an injury or shock, may be sufficient evidence of the exciting event. *See* RAY, LAW OF EVIDENCE, *supra*, § 911.5 (Supp.1990). Even if we apply the less demanding standard, there is no evidence in this case to reflect injury to the child or that the complainant suffered a sexual assault. We accordingly hold the hearsay testimony of the outcry witness as to facts, lacking other proof that the offense occurred, was not admissible as substantive evidence of the offense. Neither article 38.072 nor Rule 803(2) supports the admission of these hearsay statements. It was error to admit the hearsay statements over objection.

■ The next inquiry is whether the error requires reversal. We must reverse the judgment unless we determine beyond a reasonable doubt that the error made no contribution to the conviction or punishment. TEX.R.APP.P. 81(b)(2); *Harris v. State*, 790 S.W.2d 568, 585–88 (Tex.Crim. App.1989) (discussion of standard applied under harmless error rule). We cannot determine beyond a reasonable doubt that the admission into evidence of the hearsay statements, the only proof offered of the alleged sexual assault, made no contribution to the conviction or punishment. Point of error three is sustained.

In view of the disposition of point of error three, it is unnecessary to discuss

point one (abuse of court's discretion to rule the complainant was competent to testify) and point two (abuse of court's discretion in permitting closed circuit televising of the child). The argument of denial of confrontation of the declarant witness was mentioned but not pursued in appellant's brief. Suffice to say that the record bears out that there was no opportunity at trial for full and effective cross-examination of the child complainant. In this case the State presented the child declarant to *testify*. There was never any question that her in-person testimony at trial, as the speaker-declarant, was meant to constitute the foundation for the hearsay testimony of the listener-outcry witness. *See generally, Buckley v. State,* 786 S.W.2d 357 (Tex.Crim.App.1990) (discussion of constitutional questions of confrontation).

### Sufficiency of the Evidence

■ Although point of error four states that the failure to grant a directed verdict was error, we agree with the State that appellant waived that possible error when he presented defensive evidence. *See Kuykendall v. State,* 609 S.W.2d 791 (Tex.Crim.App.1980). However, the State recognizes that the argument presented under that heading is insufficiency of the evidence to support the conviction. Appellant contends that without the inadmissible evidence, there is insufficient evidence to sustain the conviction. The State correctly notes that, contrary to this contention, the appellate court must consider all the evidence, including any that was erroneously admitted. *See Bass v. State,* 732 S.W.2d 632, 636 (Tex.Crim.App.1987). But appellant further argues that:

> Even with the improper testimony of [the child] and Connie Lopez, the State failed to prove the appellant intentionally or knowingly sexually abused anybody, which is required for a conviction....

Thus, appellant maintains that all the evidence, proper and improper, is insufficient to support the conviction. *See Porier v. State,* 662 S.W.2d 602, 606 (Tex.Crim.App.1984).

■ The question on appeal is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Valdez v. State,* 776 S.W.2d 162, 165 (Tex.Crim.App. 1989). As earlier noted, we are required to view all the evidence when ascertaining sufficiency of the evidence, even the evidence which was erroneously admitted. *See Faulder v. State,* 745 S.W.2d 327, 330 (Tex.Crim.App.1987). Consequently, in many cases the ensuing error will be "trial error," and not "insufficiency of the evidence error."

■ In the present case the jury charge was based on proof of contact of the female sexual organ of the child with the sexual organ of appellant. TEX.PENAL CODE ANN. § 22.021(a)(1)(B)(iii) and (a)(2)(B) (Vernon 1989). Our review of the evidence discloses that the *only evidence* of sexual assault came from the outcry witness. Like *Voight v. State,* 662 S.W.2d 420 (Tex.App.—Corpus Christi 1983, pet. ref'd), this is a circumstantial evidence case. As a general rule, after the evidence is viewed in the light most favorable to the verdict, the appellate court applies the "reasonable hypothesis" analysis: if the evidence supports an inference other than guilt of the defendant, a finding of guilt beyond a reasonable doubt is not a rational finding. *See Little v. State,* 758 S.W.2d 551, 562 (Tex.Crim.App.1988).

For instance, in *Voight* the element of penetration by the defendant's sexual organ was proved by circumstantial evidence. That proof included sperm found in medical examination of the child, evidence of penetration of the child's vagina, bruising and tenderness of the child's neck and head, and the six year old victim's testimony that the defendant choked her. *Voight,* 662 S.W.2d at 422. In addition, a seven year old boy testified that the victim and defendant were in the same bed next to him, and he heard the defendant tell the girl to commit a sex act. He heard the girl tell the defendant to "get off." Thus, in that

case, circumstantial evidence proved that penetration occurred and that the defendant committed the criminal act. *Id.* at 423.

In *Nilsson v. State,* 477 S.W.2d 592 (Tex. Crim.App.1972), penetration was also proved by circumstantial evidence. The court held that when there is evidence that the acts of an accused render his victim unconscious [that child had been given a drug by the defendant], the testimony of the victim concerning penetration is not essential to the state's case so long as that element of the offense can be established by other evidence. *Id.* at 596. The essential element was established by circumstantial evidence.

■ The present case differs from the typical circumstantial evidence case where there is some inculpatory evidence. While the case at bar is a circumstantial evidence case, we are compelled to hold there is no evidence to establish that the sexual organ of appellant contacted the female sexual organ of the child, the essential element of the offense. Therefore, it was not proved that the criminal offense was committed. As well, it was not proved that appellant committed the offense, another essential element.

The "testimony" of the complainant, *see* n. 3, shows she nodded her head affirmatively when asked, "Has anyone ever touched you in a bad way?" But when asked, "Who has touched you in a bad way?", she answered, *"I don't know."* Next was the inquiry, "When that someone touched you in a bad way; where did they touch you?" But the child refused to answer. When asked, "Can you tell me that person's name?", the child shook her head negatively. Further, she said "no" when asked if she knew a person named Joseph, and she failed to identify "Joseph," the appellant, whom she viewed on T.V. in the courtroom.

The "testimony" of the complainant failed to substantiate what the outcry witness said. In fact, we find that it disputed and denied what that witness had said. The sparse statements and "nods" of the child refute that any offense occurred.

Moreover, the outcry witness used terms like "messing with," which were her own narration ("I guess he messed with her then."), words which admittedly the child did not employ. This does not meet the exacting requirements of the "excited utterances" exception to the hearsay rule.

We find that no offense was proved and, further, even if an offense had been proved, it was not shown that appellant did commit the offense charged. We conclude that a rational trier of the facts could not have found all the essential elements of the offense beyond a reasonable doubt. Accordingly, we reverse the case and, as directed by *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) and *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978) order that a judgment of acquittal be entered.

### APPENDIX

Whereupon,

### [COMPLAINANT]

THE WITNESS, after having been first duly cautioned and sworn to tell the truth, the whole truth, and nothing but the truth, testified upon her oath as follows, to-wit:

### DIRECT EXAMINATION

QUESTIONS BY MS. CRUZ:

Q. A——, do you remember me? I'm Diana. Can you tell me your name?

A. (Witness nodding head affirmatively.)

Q. What's your name?

A. A——.

Q. What's your last name?

A. Lopez.

Q. So, your full name is A—— Lopez; is that right? Yes, no?

A. (Nodding head affirmatively.)

Q. Can you tell me?

A. (Nodding head affirmatively.)

Q. Okay, A——, do you have any brothers or sisters?

A. (Nodding head affirmatively.)

Q. Is that a yes or is that a no?

A. (Nodding head affirmatively.)

Q. Is that a yes or is that a no, A——?

A. A yes.

Q. Okay. What are your brother's and sister's names? Can you tell me their names, A___?

A. No.

Q. What's your brother's name?

A. (No response.)

Q. A___, can you look up, please? What's your brother's name?

A. (No response.)

Q. Can you tell me what your brother's name is, A___?

A. (Unintelligible.)

Q. I'm sorry. I can't hear you. Can you speak up a little bit?

A. (No response.)

Q. How many brothers and sisters do you have?

A. (Indicating.)

Q. How many? Can you tell me how many?

A. (No response.)

Q. A___, are you in school?

A. (Witness shaking head negatively.)

Q. Have you been to pre–K?

A. (Witness shaking head negatively.)

Q. No, you haven't, huh? How old are you, A___?

A. I'm six or seven.

Q. How old are you?

A. (Unintelligible.)

Q. I'm sorry. I didn't hear you.

A. Six or seven.

Q. Six or seven?

A. Uh–huh.

Q. You're six or seven? Is that what you said?

A. (Indicating.)

Q. How old are you?

A. Seven.

Q. And how—when is your birthday?

A. I don't know.

Q. Can you tell me when your birthday is?

A. No.

Q. How old is—do you know who Genevieve is?

A. No.

Q. You don't know who Genevieve is?

A. No.

Q. Do you know how to color?

A. (Nodding head affirmatively.)

Q. Do you color pretty good, do you think?

A. Uh-huh.

Q. Do you, like, stay in the lines, or do you go outside the lines?

A. Outside.

Q. You go outside the lines when you color?

A. (Witness shaking head negatively.) Give me that, give me that, give me that.

Q. A___, do you remember Christmas time?

A. No.

Q. Do you know what a Christmas tree is?

A. No.

Q. And what are you doing during the summer?

A. Nothing.

Q. Do you go swimming? Do you know how to swim?

A. (Nodding head affirmatively.)

Q. Where do you go swimming, do you know?

A. No, I don't go swimming.

Q. Okay.

A. Give me that color book.

Q. Can you tell me who Vanessa is?

A. No.

Q. What street do you live on, A___?

A. I don't know.

Q. Do you live on Lena Horne?

A. (Nodding head affirmatively.)

Q. Who lives there with you?

A. Nobody.

Q. Does your mom live there with you?

A. No.

Q. What's your mom's name?

A. Connie.

Q. What's her last name?

A. Huh?

Q. No, don't do that. What's her last name?

A. Huh?

Q. What's her last name? What's your mom's last name?

A. Lopez.

Q. So, is that the same last name as yours?

A. (Nodding head affirmatively.) Will you get me the color book?

Q. A——, do you know a person by the name of Joseph Rodriguez?

A. No.

Q. Do you know a person by that name?

A. No.

Q. Do you know Moses?

A. Yes.

Q. Who is Moses?

A. Uh—

Q. Is he your uncle?

A. No. Give me my coloring book. Give me my coloring book.

Q. Do you remember—has anyone ever touched you in a bad way, A——?

A. (Witness nodding head affirmatively.)

Q. Who has touched you in a bad way?

A. I don't know.

Q. When that someone touched you in a bad way, A——, where did they touch you?

A. Give me my coloring book.

Q. A——

THE COURT: Will you tell her that she can't have her coloring book right now?

Q. (Ms. Cruz continues) A——, you can't have your coloring book right now. You have to wait, okay? You'll get it later, but you have to wait. A——, can you sit up please? Can you tell me who touched you in a bad way?

A. (No response.)

Q. Can you tell me that person's name?

A. (Witness shaking head negatively.)

Q. When that person touched you in a bad way, were you at your house or someone else's house or where?

A. (Unintelligible.)

Q. You were where?

A. (No response.)

Q. Were you at your house?

A. (Witness nodding head affirmatively.)

Q. And what room were you in?

A. (No response.)

Q. Can you tell me what room you were in?

A. (Witness shaking head negatively.)

Q. Who all was there, A——, when someone touched you in a bad way? A——, can you sit up, please?

A. No.

Q. Who all was there? Who all was in the room when that happened?

A. (No response.)

Q. Can you tell me, please?

A. No.

Q. Are you scared?

A. (No response.)

Q. Are you afraid, A——?

A. (No response.)

Q. A——, how many people do you see on the TV set?

A. One.

Q. How many people do you see?

A. One.

Q. Who is that?

A. You.

Q. Can you see anybody else?

A. No. Yes.

Q. How many men do you see?

A. Four.

Q. Okay. How about sitting at the table? How many men do you see sitting at the table?

A. Three.

Q. Is Joseph sitting at the table?

A. No.

Q. A——, do you remember when you told the Judge that you were going to tell the truth?

MR. WHITE: Objection, Your Honor, I don't think that was stated.

THE COURT: It's overruled.

Q. (Ms. Cruz continues) Do you remember?

A. (Witness shaking head negatively.)

Q. You don't remember when the Judge told you to tell the truth?

A. (Witness shaking head negatively.)

Q. A——, do you know that you have to tell the truth and that it's important to tell the truth?

A. Uh-huh. Give me my coloring book.

Q. Do you want to talk to me, A___, and tell me what happened?

A. No.

Q. How come?

A. Because.

Q. Why don't you want to talk to me and tell me what happened?

A. (Unintelligible.) Give me my coloring book.

MS. CRUZ: Your Honor, at this time we pass the witness.

MR. WHITE: Your Honor, we have no questions, just an objection. We would ask that the—we would ask the jury to disregard this testimony as coming from an incompetent witness. She shows obviously that she can't relate anything that she is interrogated about.

THE COURT: Well, we'll see. You have no questions?

MR. WHITE: No, Your Honor.

THE COURT: All right.

MR. WHITE: I don't think she is competent to answer any.

THE COURT: I understand your objection. I just asked you if you had any questions.

MR. WHITE: No, Your Honor.

THE COURT: All right. Tell the—Ms. O'Hara to turn off the video equipment down there, to take out the tape and to give it to my bailiff.

MS. CRUZ: Okay. Danette?

MS. O'HARA: Yes.

MS. CRUZ: Could you please take out the videotape and give it to the bailiff?

THE COURT: And tell Mr. Gladden to bring it back to me in court.