In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-01-00102-CR

____________


LORI ANN JONES, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 338th District Court 

Harris County, Texas

Trial Court Cause No. 841709 





O P I N I O N


 A jury convicted appellant, Lori Ann Jones, of injury to a child, appellant's
daughter, S.R., by failing to provide reasonable medical care on or about February 6,
2000. The jury assessed punishment at life in prison. Appellant challenges her
conviction on the grounds that the trial court committed reversible error by permitting
S.R.'s foster mother to testify as an "outcry" witness and by imposing cruel and
unusual punishment, i.e., the life sentence. Appellant further contends the evidence
is legally and factually insufficient to support her conviction. We affirm. 

 Facts 


 Children's Protective Services (CPS) removed S.R. from the custody of
appellant, her biological mother, when S.R. was 13 days old, and placed her in foster
care in the home of Rhonda and John Topping, where S.R. was one of several natural,
adopted, and foster children. Appellant had three other daughters, two of whom CPS
also removed from appellant's care. S.R. remained with the Toppings until she was
three and one-half years old, when CPS returned her to appellant's custody. S.R. was
the last child to be returned to appellant, and CPS assigned a specialized, family-reunification caseworker, Wanda Benton, to monitor appellant regularly on the
progress of reuniting S.R. with her. Benton visited weekly at first and then twice
monthly. Approximately two months after S.R. returned to appellant's custody, the
father of all four daughters began living with appellant. 

 In November 1999, approximately six months after S.R. had been returned to
appellant's custody, Benton noticed and inquired about S.R.'s thigh, which appeared
swollen. Appellant claimed S.R. was injured while in foster care with the Toppings. 
In response to further inquiries by Benton, appellant maintained she had obtained
medical attention for S.R. from Dr. Sidiqui, a pediatrician, and had taken S.R. to West
Houston Hospital. Appellant also told Benton the doctors were "thinking about
having x-rays" if the condition did not improve. In addition, appellant showed
Benton a brace and orthopedic shoes S.R. was to wear at night. Benton noticed,
however, that S.R. could not walk without limping and that this condition gradually
worsened, to the extent that she had to be carried. Appellant told Benton the doctors
had indicated S.R. should not put any pressure on the leg. Based on appellant's
comments and the orthopedic equipment, Benton concluded appellant was doing what
was necessary for S.R.

 Dr. Mohammed Sidiqui treated S.R. only once, on November 1, 1999, for a
swollen and tender ankle. Appellant told Dr. Sidiqui that S.R. had fallen from a bunk
bed two days before consulting him. Because the ankle was swollen and very tender
to any kind of movement, Dr. Sidiqui felt S.R. would best be cared for at the West
Houston Hospital emergency room just below his office, where an orthopedic surgeon
could be consulted immediately. He instructed appellant to take S.R. there. 
Appellant claimed she complied and consulted a physician, whom appellant identified
as a female, but the hospital had no record of this visit. 

 Benton visited appellant on Sunday, February 6, 2000, but did not see S.R.,
who was then four and one-half years old, among the children. Appellant explained
that S.R. was sick with a cold and resting in appellant's bedroom and also said she
had taken S.R. to the hospital, where she was diagnosed with an upper respiratory
infection. In addition, appellant told Benton S.R. had fallen on a curling iron and had
a burn on her forehead. When Benton insisted on seeing S.R., she found her lying in
bed with a bandana wrapped around her head. Her eyes were closed, and she was
listless and did not move. Benton pulled the covers back and noticed that S.R.'s leg
appeared swollen and bent, and her face appeared puffy and swollen. On removing
the bandana covering S.R.'s head, Benton discovered an "immediately noticeable"
head injury with extensive swelling and a large, "sponge-like" area that was tender
to the touch. She also noted that S.R.'s hair had become thin, as compared to the full
head of hair she had when she left the care of her foster parents nine months earlier. 
When Benton told appellant S.R. needed emergency treatment and called 911,
appellant quickly lost control and began hitting the walls and furniture, claiming
Benton had accused her of child abuse. She showed no concern about S.R. or her
injuries. Appellant rode in the ambulance with S.R. Benton alerted her supervisor,
whom she arranged to meet at the hospital, and followed the ambulance in her own
car with appellant's three other daughters. 

 Houston Police Officer Karen L. Wester was dispatched to Southwest
Memorial Hospital to investigate. After locating S.R. in the emergency room and
speaking with the nurses and hospital staff, Officer Wester contacted the juvenile
division, which dispatched two child-abuse investigators to the hospital. Based on
information she obtained indicating that S.R. might not survive her injuries, Officer
Wester also contacted the homicide division, which dispatched two homicide
investigators. 

 Dr. John Milton Quinn was the emergency-room physician who treated S.R.
at Southwest Memorial Hospital. He examined her for approximately two hours. Dr.
Quinn remembered the case vividly because S.R. was extremely ill and had numerous
injuries from head to foot. Dr. Quinn described the injuries as severe and shocking.
They included the following: on the right side of S.R.'s head, a large hematoma of
the scalp, which was soft and "boggy" and contained a "large, large amount of
blood"; on the left side of her head, a similar, but smaller injury; discolored eyelids;
a blackened right eye; in the eyeball of one eye, a subconjunctival hemorrhage; in the
center of her forehead, a one-inch burn mark; on her right upper lip, a quarter-inch
cut; all over her face, many scars, from one-eighth to one-half inch in size; in the area
of her jawline, crescent-shaped bruises or abrasions, as well as a type of bite mark;
on her chest, 30 to 50 healed scars, which varied in length from one-eighth of an inch
to one inch in length; on her back, the same approximate number and type of scars,
as well as fresher scabs, about a centimeter in size, from recent wounds that appeared
to be from abrasions or healing burns; both arms were deformed in the shoulder area
and just above the elbow; the area at the base of her left hip was tender and produced
a popping sound when palpated; her right hip turned outward abnormally and was
deformed by a large bulge that was swollen but firm and purplish in color; her left hip
also bulged outward; her right leg was shortened in length and bruised, and its calf
and shin muscles were atrophied and thin; her right knee was also bruised and her
right shin had a hard, bony swelling; her right foot was swollen and discolored. 

 Dr. Quinn described appellant as "oblivious" to S.R.'s pain and noted she never
spoke directly to S.R. in the emergency room and made no effort to comfort her. At
one point, as Dr. Quinn was describing and pointing out S.R.'s injuries to appellant,
she responded by pushing on the areas. Dr. Quinn felt he had to keep appellant away
from S.R. to prevent her from putting any more pressure on S.R.'s injuries. When Dr.
Quinn asked appellant when S.R. had last been walking, appellant said S.R. had not
walked for a month. When Dr. Quinn explained to appellant that S.R.'s condition
was very serious and asked how the injuries occurred, appellant became upset and
defensive. She first said she did not know and then suggested S.R. might have fallen
from a bunk bed. Dr. Quinn found appellant's explanations for S.R.'s injuries
inconsistent and medically impossible.

 Dr. Quinn ordered X-rays of S.R.'s entire body. These revealed she had
sustained at least one untreated fracture in each of her extremities. Her body's
attempt to heal itself had resulted in a massive amount of calcification that had fused
her right leg to the hip joint and prevented her from walking. Dr. Quinn estimated
this pelvic fracture was at least six weeks old. S.R.'s arms and elbow joints had
similar calcifications from unhealed fractures. Dr. Quinn described these as angular
or torsional fractures caused by twisting of the arm and indicative of child abuse. A
CAT scan of S.R.'s brain revealed hygromas (areas of fluid between the skull and the
brain) on both sides of her frontal lobe. Blood tests done out of concern that she was
malnourished revealed she was anemic. S.R. had a "very flat" affect and was quiet
and withdrawn. Dr. Quinn suspected psychological trauma. S.R. never cried, despite
the severity of her injuries, and spoke only minimally and in a monotone, with a slight
speech impediment. Dr. Quinn described some of S.R.'s injuries as recent and acute,
while others were several months old. He attributed all of S.R.'s injuries to trauma
inflicted by an adult and consistent with extended child abuse. 

 Cheryl Becker, who supervised Benton at CPS, interviewed appellant at
Southwest Memorial Hospital. Appellant initially responded to Becker's questioning
by suggesting that S.R. might have been injured when she fell out of bed two weeks
before, but began to ask Becker to describe the injuries so that appellant could explain
how they happened. Becker felt appellant was being evasive and asked these
questions in order to "make up" an appropriate explanation. 

 S.R. was transferred to Texas Children's Hospital (TCH) after her evaluation
at Southwest Memorial. Beth Rodriguez, a crisis-intervention social worker,
evaluated S.R. on arrival at TCH. Rodriguez described S.R. as "very injured" and in
"critical" condition, but nevertheless smiling and soft-spoken. Rodriguez felt that
fear prompted S.R.'s compliant, agreeable manner. In addition, Rodriguez noticed
that, although S.R. had an obvious laceration on the bridge of her nose, the pink
pigmentation that normally accompanies a laceration was not present. On closer
inspection, Rodriguez discovered S.R. was wearing makeup that had been "very
precisely applied," necessarily by an adult. As Rodriguez wiped the makeup away,
she saw a much more pronounced laceration on the nose, as well as a black eye and
a healing burn on S.R.'s forehead. 

 Dr. Pamela Bailey, a board-certified pediatric emergency physician with 10
years experience in her specialty and four additional years experience in pediatrics,
examined S.R. in the TCH emergency room. Dr. Bailey remembered S.R.'s case very
clearly as "the worst case" of child abuse she had ever seen. Because of the extent
of S.R.'s injuries, which Dr. Bailey described as "from head to toe," Dr. Bailey's
immediate concern in treating S.R. was to assess for life-threatening injuries and rule
out that possibility. Dr. Bailey had significant concern about S.R.'s "obvious"
psychological trauma, which she described, based on her extensive experience, as
"very much" consistent with a child who has been "abused and abused and abused."
Although she was fearful of the medical procedures being performed on her, S.R.
nevertheless remained passive. She never cried. She spoke very little, but, when she
did speak, said only, "I'm a bad girl. I'm a bad girl." Dr. Bailey explained this, too,
is typical of child-abuse victims. After stabilizing S.R., Dr. Bailey's assessment of
her injuries was generally consistent with Dr. Quinn's. In addition, Dr. Bailey
documented a skull fracture and 30 "loop" marks, which indicated S.R. had been
beaten with a looped cord. 

 When asked whether a hand could inflict the type of calcified muscle trauma
she observed on S.R.'s right leg, Dr. Bailey replied that an object of far greater force
would be needed and suggested a baseball bat. With respect to S.R.'s head injury, Dr.
Bailey opined it was caused by direct trauma, such as would occur if the child had
been thrown against a wall. Because of the extent of the trauma to the head and
resulting hematoma, Dr. Bailey was concerned about the possibility of infection and
described the injury as life threatening.

 Dr. Bruce Duncan Perry, chief of psychiatry at TCH, also treated S.R. Dr.
Perry described S.R.'s regressed behavior as consistent with post-traumatic stress. 
Although S.R. was four and one-half years old, she acted much younger. Dr. Perry
worked with S.R. many times to assure her she was safe and would not be harmed. 
He also worked with the nursing staff to explain background issues relevant to S.R.'s
behavior and worked with the Toppings when the decision was made to return S.R.
to their foster care. On witnessing S.R.'s reunion with the Toppings, Dr. Perry said
it was the first time he had seen her smile spontaneously. 

 S.R. was five years old when she testified by closed circuit television at trial.
When asked how she got a scar that was still visible on her forehead, S.R. said "Lori
(appellant) hurt it." When asked how, S.R. replied, "A shoe." When asked about
"hurts" on her arms, legs, bones, and stomach, S.R. replied that appellant hurt her by
using boots and a belt. S.R. also stated appellant hurt her with hot water. When
asked to touch her nose with her hand and could not, S.R. said that appellant had hurt
her arm. (1) 

 Appellant admitted she struck S.R. on two different occasions with her purse
strap, and identified certain of S.R.'s scars as resulting from those incidents, but
denied any other abuse. Appellant denied knowing how the injuries Benton observed
on February 6, 2000 had occurred and denied ever hitting S.R. with a book or her
hand. When reminded of the testimony of Benton and Drs. Quinn and Bailey,
appellant claimed they were lying. She claimed that bowel and bladder incontinence
caused the scars the physicians noted on S.R.'s back, buttocks, and ankle, that another
child had inflicted the black eye noted by Drs. Quinn and Bailey, and that S.R.'s
hematoma was the result of an accidental fall on a curling iron. 

Outcry Testimony


 In her first issue, appellant contends the trial court erred by permitting Rhonda
Topping to testify as a second outcry witness, over appellant's hearsay objection. 
Appellant argues that Topping was the second person to testify that S.R. said
appellant hit her with a belt and a shoe, while article 38.072 section 2(2) only allows
the first outcry witness to be exempt from the hearsay rule.

 Hearsay references to a child-victim's statements about an offense are
admissible as provided by article 38.072 of the Code of Criminal Procedure. Article
38.072, entitled "Hearsay Statement of Child Abuse Victim," states, in part, as
follows:

 Sec. 2. (a) This article applies only to statements that describe the
alleged offense that:


 (1) were made by the child against whom the offense was
allegedly committed; and 


 (2) were made to the first person, 18 years of age or older, other
than the defendant, to whom the child made a statement about the
offense.


Tex. Code Crim. Proc. Ann. art. 38.072 § 2(a) (Vernon Supp. 2002). Article 38.072
further provides that the hearsay rule does not bar a statement that meets the
requirements of subsection 2(a) if the party intending to offer the statement complies
with the notice provisions in subsection 2(b)(1) (A-C) of the article (2) and:

 (2) the trial court finds, in a hearing conducted outside the presence of
the jury, that the statement is reliable based on the time, content, and
circumstances of the statement; and 


 (3) the child testifies or is available to testify at the proceeding in court
or in any other manner provided by law. 


Tex. Code Crim. Proc. Ann. art. 38.072 § 2(b)(2)-(3) (Vernon Supp. 2002). 


 Provided the requirements of article 38.072 are met, the statute contemplates
allowing the first person to whom the child described the offense to testify about the
statements the child made, despite the hearsay nature of the statements. See Long v.
State, 800 S.W.2d 545, 547 (Tex. Crim. App. 1990); Sandoval v. State, 52 S.W.3d
851, 855 (Tex. App.--Houston [1st Dist.] 2001, pet. ref'd). More than one outcry
witness may testify about different events, however. Broderick v. State, 35 S.W.3d
67, 73 (Tex. App.--Texarkana 2000, pet. ref'd); Hernandez v. State, 973 S.W.2d 787,
789 (Tex. App.--Austin 1998, pet. ref'd).


 Outcry to Officer Soriano


 Houston Police Officer Dahlia Soriano was dispatched to Southwest Memorial
Hospital on February 6, 2000, to investigate alleged abuse of a four-year-old with
broken bones and several injuries. On arriving at the hospital, HPD homicide
investigators told Officer Soriano that S.R. might not survive. Once S.R.'s condition
was stabilized, the police investigation was turned over to Officer Soriano and her
partner, Officer Domingas. 

 Officer Soriano conducted a videotaped interview of S.R. after she was
transferred to TCH. When asked whom S.R. identified as the person who hurt her,
Officer Soriano stated that S.R. replied, "Ashley did it. Ashley. Ashley." (3) 
Appellant's counsel objected on hearsay grounds at that point. (4) The trial court
overruled the objection after the prosecutor indicated Officer Soriano was one of two
"outcry" witnesses, and that notice had been provided. The prosecutor's questioning
of Soriano continued as follows, without objection by appellant:

 PROSECUTOR: . . . . When she said that Ashley did that, how did
you respond to her?


 SORIANO: I said, "Who else?" And she would say her other
siblings. 

 "And who else?" Then she would say, "Somebody
else." She would give me like her sister's name and
then her other sister and then her other sister. (5) Then
she said, "Mommy."


 PROSECUTOR: And did she tell you whether or not anyone told her
to say that her sisters did it?

 . . . .


 SORIANO: . . . . [S]he said, "Yes." She said, "My mommy."


 PROSECUTOR: . . . . [W]hat did she tell you about how she got her
injuries?


 SORIANO: [Reading from her report] I asked her if her mother
ever hit her and that's when she said yes. 


 PROSECUTOR: What - did she indicate what her mother would hit
her with?


 SORIANO With a belt, toy, shoe, hanger.


 On redirect examination of Officer Soriano by the prosecutor the following
exchange occurred, again without any objection by appellant:

 PROSECUTOR: . . . . Did you - when you were interviewing [S.R.],
did you point to an injury on her stomach and ask
her specifically how she got that injury?


 SORIANO: Yes, I did.


 PROSECUTOR: What did she say?


 SORIANO: She said extension. Extension cord. Extension.


 PROSECUTOR: Did she say who had done that to her?


 SORIANO: She said, "My mom."


 PROSECUTOR: Did you ask her specifically what happened to her
head? 


 SORIANO: I believe I did. Yes, I did. 


 PROSECUTOR: What did she say?


 SORIANO: She said, "My mom hit me with a book."


 Following this testimony, the trial court conducted a hearing, outside the
presence of the jury, as a follow-up to appellant's only objection to the preceding
testimony by Officer Soriano. Appellant's objection was premised on Rodriguez v.
State, 802 S.W.2d 716 (Tex. App.--San Antonio 1990, aff'd as reformed, 819
S.W.2d 871 (Tex. Crim. App. 1991) (holding that article 38.072 required
complainant's availability to testify). After considering the arguments of counsel, a
videotape of Officer Soriano's interview of S.R., and after the State indicated that
S.R. was both available to testify and would testify, the trial court ruled as follows:

 . . . [F]rom viewing the videotaped statement [I find] that it's a
fairly lengthy videotaped statement between Officer Soriano and the
child. And the child related to Officer Soriano details of the offense and
who injured her in a tape that . . . is . . . [p]robably about 10 to 15
minutes long. The only two people in the videotape are the child and the
officer, and I would speculate that the child speaks more often than the
officer in the tape. That the officer is asking questions and the child is
providing information, which is different from my reading of the
Rodriguez case where the child that appears never gave anybody any
kind of real information about the offense.

 

 So I am finding that the child is available to testify. I'm also
finding that the child's statement is reliable - the child's statement to
Officer Soriano is reliable based on the time content and circumstances
of the statement; and it's frankly very lengthy, and that the officer gave
only some of the information to this jury and not all the information
contained in the videotape statement. 


 So, I did rule that the hearsay statement for from [sic] officer - the
hearsay testimony given by Officer Soriano was admissible. And having
discussed this further with the attorneys and reviewed the hearsay
statement further outside the presence of the jury in Article 38.072 -
with regards to Article 38.072, I am finding, again, that the hearsay
statements to Office Soriano are admissible and will allow the jury to
consider them in this case. 



 Outcry to Rhonda Topping



 The trial court then expressed concern about the admissibility of a second
outcry statement under article 38.072 and considered preliminary argument by the
prosecutor, based on Hernandez, but reserved ruling on the admissibility issue. When
trial resumed the following Monday, the trial court conducted a voir dire examination
of Rhonda Topping, outside the presence of the jury, to determine the admissibility
of her statement describing S.R.'s outcry to her. Topping explained S.R.'s many fears
when she was returned to the Toppings and how S.R. gradually began to describe
those fears, as well as how she was injured. As S.R. made these disclosures, Topping
recorded them in journal or diary form, using S.R.'s exact words. When the
prosecutor asked whether S.R. told Topping how her legs were injured, Topping
replied, "She would say that Lori messed her bones up." Appellant's counsel
objected as follows:

 Objection, Your Honor. I renew my objection under the case of
Rodriguez versus the State of Texas cited at 802 SW2d 716 with the
proposition that if the child is not available to testify, (6) then any outcry
statements that may come in from the outcry witness would be hearsay
because the defense has nobody to confront, Your Honor.


 THE COURT: Overruled. You can confront this witness. 


Topping then testified, without further objection, that S.R. said her bones "didn't
work" because appellant had "messed" them "up." S.R. told Topping that appellant
had hit her with a belt, boot, or shoe. S.R. also told Topping that appellant had
messed up her arms, pushed her on the floor, made her head bleed, and put her in hot
water.

 After ascertaining that S.R. was available to testify by closed-circuit television
if called by either side, and after reviewing Hernandez, the trial court ruled as
follows:

 THE COURT: Pursuant to [a]rticle 38.072, we just had a hearing
outside the presence of the jury with regards to hearsay testimony from
Rhonda Topping and which I find is reliable based on the time[,]
content[,] and circumstances of the statements from the child. 
Therefore, I am going to overrule the defense's objection with regards
to the hearsay and allow Ms. Topping to testify regarding these hearsay
statements from the child. 


 I do find that the statements that she is going to testify about are
different from the statements that D.M. Soriano previously testified
about. So, I do not find her statements repetitious in any way, and find
she is the initial outcry witness with regards to the statements that she
just testified about. So, I will allow her to testify. 


 You certainly have the right to object at the time, if you'd like to. 
If not, I think you have made your objection for the record. So however
you wish to do that in front of the jury is fine.

 

 Testifying before the jury, Topping described the journal she kept to record
S.R.'s statements, as they occurred, about how she was injured. S.R. also told
Topping, regarding her legs, that appellant had hurt her legs and messed her bones
up. S.R. told Topping that appellant had hurt her with a belt or hit her with a shoe. 
One time when Topping was holding her baby in the air, S.R. said that appellant had
held her like that and then thrown her down. S.R. told Topping that appellant had
made her head bleed, but did not say how. Regarding her arms, S.R. said appellant
messed them up so that they did not work and that appellant hit her with "that belt"
or "that boot." 


 Analysis


 This is a case involving more than one injurious event. The two outcries did
not clearly delineate, however, what injuries, caused by what instrumentalities, took
place on what date. The injuries observed on February 6, 2000, were both relatively
fresh, such as the hematoma to the head, and relatively stale, such as the fractures of
all S.R.'s limbs. The State brought three separate indictments, alleging injury to a
child: (1) by several means (unknown object, extension cord, book, and appellant's
hand) on or about November 1, 1999; (2) by several means (unknown object,
extension cord, and book) on or about February 6, 2000; and (3) by failing to provide
reasonable medical care to the child on or about February 6, 2000. All three charges
were tried together to the same jury. 

 We can determine from the record that only Officer Soriano testified about
S.R.'s outcry concerning the injury to her head caused by appellant hitting her with
a book. Likewise, only Rhonda Topping testified about S.R.'s outcry concerning
appellant's having "messed up" S.R.'s arms so that they did not "work," by hitting
S.R. with "that belt" and "that boot." Because the hematoma on the head was a
relatively fresh injury, while the fractured arms were relatively stale, we are able to
conclude that the State was entitled to present two outcry witnesses in this trial. See
Broderick, 35 S.W.3d at 73; Hernandez, 973 S.W.2d at 789. Appellant did not
object, however, to any overlap between the two outcry witnesses. Accordingly, we
need not address that issue. We hold that the trial court did not err in allowing the
testimony of the two outcry witnesses under these circumstances. 

 Therefore, we overrule appellant's first point of error.

Life Sentence--Cruel and Unusual?

 In her second point of error, appellant contends the trial court committed
reversible error by imposing a life sentence, which amounted to a cruel and unusual
punishment. Appellant claims that her sentence violates both the United States and
Texas Constitutions. Appellant argues that evolving standards of decency, marking
the progress of a maturing society, have caused us to realize that "the child abuse
problem" cannot be solved by putting all child abusers in jail for as long as possible.

 Appellant did not preserve her second point of error by objecting at trial. Tex.
R. App. P. 33.1; see Steadman v. State, 31 S.W.3d 738, 742 (Tex. App.--Houston [1st
Dist.] 2000, pet. ref'd); Solis v. State, 945 S.W.2d 300, 301-02 (Tex. App.--Houston
[1st Dist.] 1997, pet. ref'd). Accordingly, we overrule appellant's second point of
error.

Sufficiency of the Evidence

 In her third point of error, appellant contends the evidence is legally and
factually insufficient to prove that she caused serious bodily injury to S.R. by failing
to provide reasonable medical care. Appellant points out that she took S.R. to see Dr.
Mohammed Sidiqui, allowed CPS personnel to inspect S.R. regularly, and testified
that she took S.R. to several doctors.

 We address legal sufficiency challenges by viewing the evidence in the light
most favorable to the verdict to determine if any rational fact finder could have found
the essential elements of the offense beyond a reasonable doubt. King v. State, 29
S.W.3d 556, 562 (Tex. Crim. App. 2000); Howley v. State, 943 S.W.2d 152, 155
(Tex. App.--Houston [1st Dist.] 1997, no pet.). In addressing a factual sufficiency
challenge, we ask whether a neutral review of all of the evidence, both for and against
the finding and both properly and improperly admitted, demonstrates either that the
proof of guilt is so obviously weak as to undermine confidence in the jury's
determination, or that the proof of guilt, although adequate if taken alone, is greatly
outweighed by contrary proof. King, 29 S.W.3d at 563; Rodriguez v. State, 819
S.W.2d 871, 873 (Tex. Crim. App. 1991) (evidence improperly admitted under article
38.072). We will reverse the fact finder's determination only if a manifest injustice
has occurred. King, 29 S.W.3d at 563. In conducting this analysis, we may disagree
with the jury's determination, even if probative evidence supports the verdict, but
must also avoid substituting our judgment for that of the fact finder. Id. 


 Legal Sufficiency


 Although it is undisputed that appellant consulted Dr. Sidiqui for S.R.'s ankle
injury, the jury could still have reasonably found that appellant disregarded Dr.
Sidiqui's instructions to take S.R. downstairs to be examined immediately by an
orthopedic surgeon in the hospital emergency room. Appellant ignores the evidence
that although all of S.R.'s limbs were fractured, appellant never consulted a doctor,
and that this failure to seek medical attention resulted in calcification and fusing of
the bones as S.R.'s body attempted to heal itself. Appellant also ignores the evidence
that she hit S.R. with a book, causing a life-threatening hematoma to the head, for
which appellant did not seek medical care. Applying the proper standard of review,
we conclude the evidence was legally sufficient to prove appellant caused serious
bodily injury to S.R. by failing to provide her with reasonable medical care.


 Factual Sufficiency


 Appellant's argument consists of a single sentence that the evidence is factually
insufficient because appellant testified that she took S.R. to several doctors. The
State challenges appellant's argument for failing to provide record citation, but
appellant cites to all 69 pages of her own testimony. Having taken the time to peruse
appellant's testimony, we find only one instance in which appellant claims she took
S.R. to another doctor. That was an orthopedic doctor, whom appellant identified as
a female. Appellant claims that doctor examined S.R.'s injured ankle in mid-November. But appellant could produce no medical records to corroborate this claim,
and the medical records the State introduced into evidence did not include any
reference to that consultation, even though they purported to be S.R.'s full records. 
Based on the state of the record, we conclude the evidence was factually sufficient. 
Accordingly, we overrule appellant's third point of error.


Conclusion


 We affirm the judgment of the trial court.

 

 


 Tim Taft


 Justice


Panel consists of Justices Mirabal, Taft, and Price. (7)


Do not publish. Tex. R. App. P. 47.4.
1. Two additional witnesses provided outcry testimony. We address their
testimony below in our analysis of appellant's first issue.
2. It is undisputed that the State complied with the notice provisions of subsection
2(b)(1) (A)-(C). See Tex. Code Crim. Proc. Ann. art. 38.072 § 2(b)(1) (A-C)
(Vernon Supp. 2002).
3. Ashley is one of S.R.'s sisters. 
4. A hearsay objection is sufficient to preserve error regarding violations of
article 38.072. Long, 800 S.W.2d at 548.
5. The eldest of these children was six years old at the time.
6. As noted above, the trial court had already ruled that the child was available
to testify.
7. The Honorable Frank C. Price, former Justice, Court of Appeals, First District
of Texas at Houston, participating by assignment.